**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X   **ECF CASE**
 **WAYNE COVER,**

                                               **05-CV-7039 (SCR)(GAY)**

                  **Plaintiff,**

          **-against-**                             **COMPLAINT**

**JOHN E. POTTER,**                         **Plaintiff Demands**
**POSTMASTER GENERAL,**            **A Jury Trial.**

               **Defendant.**
-------------------------------------------------------------------X


       Plaintiff, **WAYNE COVER**, by his attorneys, the Law Offices of Lee Nuwesra,

complaining of Defendant, **JOHN E. POTTER, POSTMASTER GENERAL,**

respectfully alleges as follows:

### NATURE OF THE ACTION

1.     This is an action for discrimination based on Race, Sex and Retaliation under

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.  § 2000(e) et seq.

Plaintiff also has Disability, Failure to Accommodate, and Retaliation claims, under the

Rehabilitation Act of 1973 as amended, 29 U.S.C. § 794(a), et seq.

2.     Plaintiff also seeks costs and attorneys' fees authorized by Title VII, and other

relevant Statutes.

## JURISDICTION

3.      The jurisdiction of the Court over this controversy as to enforcement of the provisions of Title VII of the Civil Rights Act of 1964, is based on 42 U.S.C. § 2000(e) et seq., and the Rehabilitation Act 1973 as amended, 29 U.S.C. § 794(a), et seq.

4.      Plaintiff, Wayne Cover has complied with all conditions precedent to jurisdiction under 42 U.S.C. § 2000(e) et seq.  Specifically, a charge of employment discrimination was filed with the Agency's Equal Employment Opportunity Office within the required period, and a notice of a right to sue was issued.  Said notice was mailed on May 6, 2005 and received by Plaintiff's counsel on May 9, 2005.  This Complaint is filed within 90 days of the receipt of said notice.

5.      The unlawful employment practices alleged below were committed within this District. Accordingly, venue lies within the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. §1391(b).

## VENUE

6.      Venue in this district is proper under Title 28 United States Code, Section 1391 (b).  At the relevant time period, Plaintiff resided in this District, Defendant conducted business in this District, and the events giving rise to Plaintiff's claims occurred within this District.

## PARTIES

7.      At all relevant times herein, Plaintiff **WAYNE COVER** was a resident of Mount Vernon, Westchester County, State of New York.

8.      Defendant **JOHN E. POTTER,** was, at all relevant times in this cause of action, the Postmaster General of the United States Postal Service, which is Headquartered in

Washington D.C., with business offices located at 1000 Westchester Avenue, White Plains, County of Westchester, State of New York.  As such he acted as Plaintiff's employer.

## STATEMENT OF FACTS

9.      In 1997, Plaintiff began his employment with Defendant Employer as a Part Time Flexible Mail Processor.

10.     At all relevant times, Plaintiff's work performance, time and attendance were satisfactory.

11.     Mr. Cover is a Dark Skinned African-American Male, who suffers from Depression/Anxiety Syndrome Complex.

12.     From 1997 until November 2002, Plaintiff was never disciplined.  He became the subject of discipline shortly after he complained that his supervisor, namely Ms. Danielle Bland, a White female, was discriminating against him.

13.     After Ms. Bland became his supervisor, he became the subject of her harassment and discriminatory conduct based on his sex, color, race, and perceived mental disability.

14.     On October 2, 2002, after Plaintiff finished processing his mail on DBCS #6, he approached Ms. Bland, who was working around DBCS #18, because she had instructed him to inform her when he finished processing the mail at his station.

15.     Ms. Bland told Plaintiff that at the conclusion of his shift, he needs to take over DBCS #18, because another female employee, namely, Tiana Barksdale had to go home. Plaintiff informed Ms. Bland that he could not stay because he had to take his kids to school.  Ms. Bland responded, "That's not my problem! If you leave I'm going to take disciplinary action! Now stay over here and finish this mail!"

16.     As Plaintiff walked away, Ms. Bland followed him all the way to the men's bathroom, stood there and waited for him to come out while calling out his name.

17.     Tiana Barksdale, asked Ms. Bland for permission to leave so she could take her kids to school.  However, Ms. Bland refused Plaintiff's similar request.  By doing so, Plaintiff felt that his supervisor was affording Ms. Barksdale preferential treatment based on her sex.

18.     Then Plaintiff went to Mr. Ruben Gonzalez, another Supervisor (Hispanic), who worked closely with Ms. Bland, and told him that he could not stay because he had to pick up his son. Mr. Gonzalez's response was, "If you leave I hope you get a good Shop Steward Union Representative."

19.     On October 3, 2002, Plaintiff was assigned the Mahopac mail.  Plaintiff attempted to run the mail at 12 a.m., but Ms. Bland interrupted him and demanded that he go back to the Manual Aisle and to stay there until 1:30 a.m.  Moreover, a service talk was scheduled for 1:30 a.m., which mandated Plaintiff's attendance.

20.     Accordingly, Plaintiff could not start the Mahopac mail until 2:05 a.m.  At 2:15 a.m., Ms. Bland instructed Mr. Cover to relieve Ms. Tonya Pettaway, during her break. This caused the Mahopac mail to be delayed for another 30 minutes.  Plaintiff was unable to resume the processing of the Mahopac mail until 2:45 a.m. He also took his scheduled lunch break at 3:30 a.m.  Plaintiff requested additional help, which was denied by Ms. Bland.  As a result, of Ms. Bland's conduct or lack thereof, the mail was not finalized until 8:15 a.m.

21.     Plaintiff believed that Ms. Bland was giving his female counterparts preferential treatment over him.  As a result, on October 3, 2002, Plaintiff filed an EEO complaint

against his supervisor, Ms. Danielle Bland, for discriminating against him on the basis of his sex.

22.     On October 5, 2002, Ms. Bland caused Plaintiff to be issued a pre-disciplinary action for allegedly delaying the mail and sabotaging the operation on October 3, 2002.

23.     On October 5, 2002, at 2:30 a.m., Plaintiff was getting postcons (supplies) from Ms. Chaunda Filder, another employee.  Ms. Bland approached him and began shouting at him and demeaning him in the presence of his co-workers.

24.     On October 5, 2002, at 5:30 a.m., Mr. David Chastenet, White, came to Plaintiff's work station and began talking to Plaintiff. Ms. Bland saw the White employee talking, but did not chastise Mr. Chastenet as she did Mr. Cover, earlier that morning.

25.     On October 8, 2002 at 2:00 a.m., Plaintiff was returning from his break along with Mr. Larry Forst, a White co-worker.  Upon observing both, Ms. Bland approached Plaintiff, and falsely accused him of being late from break.  However, she did not say anything to Mr. Forst, even though they both left for break at the same time.

26.     On October 9, 2002, at 3:00 a.m., Plaintiff was asking a female co-worker, Sheena Williams, for a magic marker and scotch tape. Ms. Bland approached Plaintiff and began shouting at him.  Plaintiff informed her that he was getting supplies to dispatch the Carrier Routes. She told Plaintiff that, she did not care, and if he did not go back to his machine, she would take additional disciplinary action against him.

27.     Meanwhile Mr. Jim Cunningham, a White employee, was away from his machine talking to Eddie, but Ms. Bland did not say anything to the White employee.

28.     On October 17, 2002, at 6:30 a.m., Ms. Bland approached Plaintiff and began yelling at him and falsely accusing him of working slow and "milking the mail". She also

threatened to stand at his machine and watch him everyday. However, she said nothing to his partner, Ms. Maritsa Rivera, a Puerto Rican co-worker.

29.     On October 26, 2002, the APWU Shop Steward, Mr. Joe T. told Plaintiff that Danielle Bland wanted to issue him a disciplinary action.  When Plaintiff inquired what would it be for, Mr. T. responded that Ms. Bland has not thought of any charges yet.

30.     On November 3, 2002, at 1:15 a.m., Ms. Bland approached Plaintiff while he was tying his shoe laces in a seated position, and began yelling at him.  Meanwhile Ms. Tiana Barksdale, was sitting down at DBCS#18 talking to Ms. Adamay Benson, another co-worker, but Ms. Bland did not say anything to either female worker.

31.     On November 9, 2002, at 6:30 a.m., Plaintiff told Ms. Bland that he could not stay longer than his scheduled tour, because he had to pick up his child. She responded, "Wayne if you leave at the end of your shift, I'm going to take disciplinary action against you!" Plaintiff told Ms. Bland that he just received a phone call that his boy was sick. Her response was, "That's your problem, not mine!"

32.     Both Ms. Bland and Mr. Gonzalez then approached Plaintiff at 6:45 a.m., and he was instructed by Ms. Bland to stay until the mail was finished. However, Ms. Bland allowed Ms. Rivera to take her smoke and bathroom breaks from 6:55 am to 7:15 a.m. before the mail was finished.

33.     On or about November 11, 2002, Plaintiff was issued a letter of warning ("LOW") by Mr. Ruben Gonzalez, for allegedly leaving before the mail was finalized.  The LOW was issued at Ms. Bland's direction.  She also claimed that Plaintiff never told her that he had to pick up his child and if she would have known, she would not have asked that a LOW be issued.

6

34.     Plaintiff timely grieved this retaliatory conduct through his Union.   Plaintiff viewed Ms. Bland's action as retaliation for filing his EEO Complaint.

35.     Although Mr. Gonzalez issued Plaintiff a LOW for 11-11-2002, for leaving to take care of his sick son, he allowed three of Plaintiff's partners to leave before the mail was finalized, without penalizing them.

36.     On November 6, 2002, Mr. Gonzalez allowed Haipeng, "Joe" Zhao, a Chinese male, to leave before the mail was finalized.   On December 2, 2002, Mr. Gonzalez allowed Maritsa Rivera, a light skinned Puerto Rican female, to leave before the mail was finalized.   On December 11, 2002, Mr. Gonzalez allowed Robert Gongorra, a Central American, to leave before the mail was finalized.   On all three occasions, Mr. Cover was left without a partner to finalize the mail, by himself.

37.     On November 16, 2002, Plaintiff attended the Step One Grievance which involved supervisor Ruben Gonzalez, and Rita Patrick, Union Vice-President.   Plaintiff explained to Mr. Gonzalez that he could not stay to finalize the mail because his son was sick. Plaintiff also explained to Mr. Gonzalez that he informed Ms. Bland of the same. Mr. Gonzalez said he was unaware that Plaintiff's son was sick and he would drop the charges but he had to speak with Ms. Bland before he could rescind the disciplinary Letter of Warning.

38.     One week later on November 23, 2002, Mr.  Gonzalez told Rita Patrick that he would not rescind the Letter of Warning, as Ms. Bland would not allow it.

39.     On November 24, 2002 at 12:30 a.m., Ms. Bland approached Plaintiff, while he was tying his shoes and insisted that he tie his shoe laces standing up.  Meanwhile, Elida Reyes, a light skinned Puerto Rican woman, was allowed to sit down behind her machine, eat fruits and read a magazine. Ms. Bland walked right past Ms. Reyes and did not say anything to her.

40.     Plaintiff was made to finish the mail on several occasions by himself, without a partner.  However, when he could not stay to work overtime, he was penalized. Other employees, including many of his partners, have left when the mail was not finished and were not penalized.

41.     For example, On December 2, 2002, Plaintiff was working on the Mahopac mail with his partner Maritsa Rivera, a Puerto Rican female, when she was allowed to leave early.  Plaintiff was sent to lunch at 5 a.m., and was rushed back to work at 5:20 a.m. After Mr. Cover realized that his partner left and that he would need another partner, he asked Mr. Gonzalez for help.  However, Mr. Gonzalez insisted that Plaintiff finish the mail by himself.

42.     There are 25 machines in the DBCS Area and Plaintiff was the only person out of 50 people who had to finalize the mail by himself, during his assigned tour.

43.     On December 8, 2002, Plaintiff returned from his break to see Ms. Bland waiting for him at his machine.  When Ms. Bland saw him, she began yelling, and falsely accusing him of being late.  Several Puerto Rican women, namely Elida Reyes, Evelyn Oliavarria and Plaintiff's partner Veronica Denizard, walked in with Plaintiff.  Ms. Bland did not yell at them or accuse them of being late, although they left for their respective breaks at the same time as Plaintiff.

44.     On December 18, 2002, Ms. Bland called mandatory overtime.  Plaintiff's partner, Ms. Anjanette Alexander, told Ms. Bland she could not stay because she had to pick up her children and asked for a 3971 Leave Slip.  Within five minutes, Ms. Bland returned with a 3971 form for Ms. Alexander.  On November 9, 2002, Plaintiff informed Ms.

Bland that he could not stay because he had to pick up his son and requested a 3971 but Ms. Bland denied his request by stating "that's your problem, not mine."

45.     On December 21, 2002, Ms. Bland approached Plaintiff and told him that he could not talk.  Meanwhile, Ms. Glory Frazier, and Ms. Veronica Denizard, a Puerto Rican, were also talking, yet Ms. Bland said nothing to them.

46.     In December 2002, Plaintiff submitted medical documentations from his healthcare provider(s) regarding his disability (Depression/Anxiety Syndrome Complex).

47.     On January 5, 2003, Ms. Bland told Plaintiff, "You have never done anything physically, but your whole demeanor is threatening! Take a good look at yourself in the mirror and you'll see what I'm talking about! I don't feel safe around you! Every time I'm near you, I feel like you are going to snap and attack me!"

48.     On January 5, 2003, at 11:00 a.m., Ms. Bland gave Plaintiff an attendance slip dated January 4, 2003, for failure to report. Plaintiff explained to Ms. Bland that he was scheduled for two days off, at the request of by his healthcare provider(s) through the Employee Assistance Program. As such, Plaintiff's Immediate Supervisor, Gretchen McGhee, scheduled him to have that night off.

49.     On January 27, 2003, Plaintiff asked Mr. Patterson if he could use his marker and tape. As Plaintiff went behind the feeder to get the marker and tape, Ms. Bland raced towards him yelling and screaming for him to go back to his machine.  Plaintiff then tried to explain to Ms. Bland that Mr. Patterson was letting him use his marker and tape and that he had to talk to him to get his permission first.  Ms. Bland's response was, "I don't care! I don't want you talking to him!"  Plaintiff immediately went back to his machine.

50.     During the shift, at 1:30 a.m., Ms. Bland called Plaintiff inside her office to issue him a seven-day suspension for being out of his work area. This disciplinary hearing took place in the presence of the Local Union Vice-President, Rita Patrick. When Plaintiff advised Ms. Bland that after, he dropped off a direct tray of mail he was in the process of borrowing supplies, her response was, "Don't worry about it, you can go back to your machine now."

51.     On the same shift, Ms. Tsi Tsi Chen, a Chinese female, left her work area to give Plaintiff a direct tray of mail.  Ms. Bland came over to Plaintiff's machine while Ms. Chen was there talking to Plaintiff, but said nothing to Ms. Chen.

52.     On February 6, 2003, Plaintiff participated in the EEO mediation process but declined to drop his charges of harassment and discrimination against Ms. Bland and Mr. Gonzalez.

53.     On February 8, 2003, Plaintiff returned back to work from his day off, where Ms. Bland called him inside her office and issued him a seven-day suspension.  Plaintiff again timely grieved this retaliatory conduct through his Union because he believed Ms. Bland was retaliating against him because, he did not drop the charges against her, two days earlier.

54.     In February 2003, Plaintiff complained to Joseph Terracciano, Tour One Union Shop Steward; Arlene McDuffie, Tour One Union Shop Steward; Kevin Grant, Tour One Union Shop Steward; Rita Patrick, Union Vice President; Frank Fanelli, Union President; Louise Yannuzi, National Business Agent for Union; Grace Dellapi, Tour One Manager; Donald Burke, Tour One Manager; Jack Corso, Tour One Supervisor; Janice Parks, Whitman Company Psychiatrist of the Employee Assistance Program; and Alan

Dockeray, Medical Doctor regarding the discriminatory remarks made by Ms. Bland about his appearance and perceived mental disability, as well as her constant discriminatory harassment of him.

55.     Defendant's agents were aware that Plaintiff could not work in the DBCS Area because he submitted medical documentation from both his Therapist and Medical Doctor.  They initially advised him not to work in the DBCS Area in April 2003, due to the stress, he was experiencing at the hands of Ms. Bland, which exacerbated his already existing mental condition.

56.     On May 9, 2003, Ms. Bland changed Plaintiff's schedule from (12 a.m. - 6 a.m.) to (1 a.m. - 7 a.m.).  Ms. Bland claimed that the reason for the schedule change was to accommodate his 6 hour work limitation.  However, Plaintiff believes that this schedule change is discriminatory because other employees namely, Henry Aguilo and Daisy Cabrera, both Puerto Ricans, can only work 6 hours but their respective schedules were not changed in the same manner as Plaintiff.  Plaintiff's schedule change interfered with his work productivity, amongst others.  Moreover, Plaintiff believes the schedule change was in further retaliation for engaging in protected activity.

57.     Notwithstanding the medical documentation, on May 16, 2003, Defendant assigned Plaintiff to the DBCS Area commencing at 1:00 a.m.  More importantly, all the other Part-Time Flexible Mail Processors were assigned to man their machines at 12:00 a.m. Additionally, Ms. Bland made Plaintiff operate the machine without a partner for two hours. Additionally, the other Part-Time Flexible Mail Processors had partners.

58.     Plaintiff informed Ms. Bland that he needed a partner and that the mail would be late if he did not get assistance. Ms. Bland's response was, "You will have to run the mail

by yourself until I send someone over!" Ms. Bland did not give Plaintiff a partner until 3:00 a.m.  Ms. Bland assigned Emily Cruz as his partner, a Filipino female.

59.     At 6:15 a.m., Ms. Bland called Plaintiff and asked if he sent out any rejects with the carrier routes. Plaintiff told Ms. Bland he did and went back to sweeping the machine. Ms. Bland called him back over again and accused him of not sending out any rejects with the carrier routes. Plaintiff informed Ms. Bland that four trays of third-class mail and one tray of first-class mail arrived at their machine after they turned over to the second pass. His partner, Emily Cruz, confirmed the same with Ms. Bland.  However, Ms. Bland unsatisfied, began to yell at her and instructed her to, "Stay out of it!" Ms. Bland then falsely accused Plaintiff of sabotaging the operation.

60.     As a result of Ms. Bland's harassment, Plaintiff experienced a headache and requested that Ms. Bland stop harassing him.  She did not.  Ms. Bland returned to Plaintiff's machine with another supervisor, Virginia Ross, and continued to falsely accuse Plaintiff of holding back seven trays of mail for Mahopac. Ms. Bland finally turned to Plaintiff and declared, "You are sick in the head and you need help!"

61.     On May 17, 2003, Ms. Bland penalized Plaintiff for the incident by issuing him a 14 day suspension, however, she did not discipline Plaintiff's partner Emily Cruz, as both partners were equally responsible for the alleged mail delay they processed.

62.     This discriminatory incident caused Plaintiff's heartbeat to accelerate rapidly and he began to get a headache.  He then asked Ms. Bland to send him to the hospital because he was in pain.  She refused asserting, "It's 6:00 a.m., punch out and take yourself to the hospital!"  Arlene McDuffie, a Shop Steward, witnessed Ms. Bland's denial of Plaintiff's request for medical attention.

63.     Due to Ms. Bland's discriminatory conduct, Plaintiff's medical/mental condition worsened.  Plaintiff could not work in the stressful DBCS Area, nor work more than six hours a day, and must have two consecutive days off every week.  Plaintiff submitted medical documentation supporting these work restrictions and medical requests, from his health care providers.

64.     On June 5, 2003, Plaintiff was transferred out of the DBCS Area due to Ms. Bland's induced stress and anxiety.

65.     On December 7, 2003, Plaintiff was working in the Manual Aisle.  Supervisor Bland approached him and inquired about his presence there.  He explained that his supervisor, Mr. Jack Corso, sent him there.  Meanwhile, there were other female workers, namely, Tsi Tsi Chen, Chinese; and Emily Cruz, Filipino talking with other workers as well.  Ms. Bland then asked Mr. Corso if he sent Plaintiff to the Manual Aisle and he responded, "Yes, what's the problem?"  She then alleged that Plaintiff was talking and not working.  Mr. Corso responded by saying, "everyone is talking, he isn't doing anything wrong, leave him alone, I just sent him over there."  He also told her she was wrong and that she should stop harassing Plaintiff.  Ms. Bland then went to a manager, Mr. Steve Grant, to complain about Plaintiff and his supervisor.

66.     On August 2, 2004, at 5:30 a.m. while Plaintiff was working in the OCR area, he was called into the office, located near the DBCS Area, by supervisor Illonka McPartland.  Accompanied with Ms. McPartland was Attendance Control Supervisor, Kathi Lamberti, and Union Representative, Marcus Gwire. Ms. McPartland informed Plaintiff that she received a letter from in-plant support stating that Plaintiff was fit for full duty and that she needs him to work in the DBCS Area.

67.     This was a sudden surprise to Plaintiff, since he has always performed full duty. The only accommodations he required were that he not work in the DBCS Area, that he only work 6 hours a day, and he have 2 consecutive days off.

68.     Plaintiff asked that he be accommodated, however, after consulting with Ms. Bland, Ms. McPartland denied that request and ordered the Plaintiff to work in the DBCS Area, changed his schedule and gave him only one day off.  All in violation of his rights to accommodation.

69.     On August 5, 2004 at 12:10 a.m., Ms. McPartland approached Plaintiff and told him to go to DBCS #11. Plaintiff again informed Ms. Mc Partland that due to his medical condition, he could not work in the DBCS Area. Ms. Mc Partland told Plaintiff, "I am going to get a Shop Steward and take you off the clock!" Five minutes later, Ms. McPartland approached Plaintiff and said, "You are officially off the clock!"  Plaintiff then asked Ms. McPartland if she contacted a Shop Steward, and she said, "Find yourself a Shop Steward!"

70.     Plaintiff complained to the Union representative Ms. Arlene McDuffie, about his newly assigned duties. The Union agreed that Management has violated Plaintiff's medical rights and a timely grievance was filed.

71.     On August 7, 2004 at 11:55 a.m., Plaintiff as requested, gave Ms. McPartland an updated note from his health provider(s) concerning his medical condition. Ms. Mc Partland took the note and discussed it with Ms. Bland. After her Conference with Ms. Bland, Ms. McPartland approached Plaintiff and said, "I received instructions not to let you on the clock unless you are willing to work in the DBCS Area!"  Plaintiff informed

Ms. McPartland that he could work in any and all areas except for the DBCS Area.  Her response was that he will only be assigned to work in the DBCS Area.

72.     As of August 7, 2004, Plaintiff was not allowed to work unless he worked in the DBCS Area.  Plaintiff viewed Defendant's conduct as a constructive discharge, because working in the DBCS Area is detrimental to his health.

73.     Upon information and belief, two employees, namely David Chastenet, White male; and Andrea McKenzi, light skinned Black female, cannot work in the DBCS Area due to their medical conditions, and they have been accommodated accordingly by Management.

74.     Plaintiff tried to get Defendant to remedy his retaliatory and discriminatory work environment, to no avail.

75.     Defendant's disparate treatment of Plaintiff and Mr. Cover's constructive discharge is discriminatory and in retaliation against him for engaging in protected activity, all in violation of Federal Law.  Defendant's conduct has caused Plaintiff to suffer loss of income, mental and emotional harm, and other non-pecuniary losses.

## DAMAGES

76.     As a direct and proximate consequence of Defendant's intentional and unlawful conduct, Plaintiff has suffered lost wages, benefits, and other non-pecuniary losses, including but not limited to emotional pain, anxiety, and had to incur expenses, including attorney's fees.

**AS FOR A FIRST CAUSE OF ACTION:**
**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**
**AS AMENDED, 42 U.S.C. § 2000(e) et seq.**
**(Race, Sex Discrimination, and Retaliation By**
**Defendant John E. Potter, Postmaster General)**

77.    Plaintiff repeats and re-avers each and every one of the allegations set forth in paragraphs 1 through 76 of this complaint with the same force and effect as if each were fully set forth herein.

78.    Plaintiff is a Black African American Male, and as such he is a member of a class of persons, who engaged in protected activity, covered by and protected by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) et seq.

79.    In 1997, Plaintiff began his employment with Defendant Employer as a Part Time Flexible Mail Processor.

80.    At all relevant times, Plaintiff's work performance, time and attendance were satisfactory.

81.    Mr. Cover is a Dark Skinned African-American Male, who suffers from Depression/Anxiety Syndrome Complex.

82.    From 1997 until November 2002, Plaintiff was never disciplined.  He became the subject of discipline shortly after he complained that his supervisor, namely Ms. Danielle Bland, a White female, was discriminating against him.

83.    After Ms. Bland became his supervisor, he became the subject of her harassment and discriminatory conduct based on his sex, color, race, and perceived mental disability.

84.    On October 2, 2002, after Plaintiff finished processing his mail on DBCS #6, he approached Ms. Bland, who was working around DBCS #18, because she had instructed him to inform her when he finished processing the mail at his station.

85.    Ms. Bland told Plaintiff that at the conclusion of his shift, he needs to take over DBCS #18, because another female employee, namely, Tiana Barksdale had to go home. Plaintiff informed Ms. Bland that he could not stay because he had to take his kids to school.  Ms. Bland responded, "That's not my problem! If you leave I'm going to take disciplinary action! Now stay over here and finish this mail!"

86.    As Plaintiff walked away, Ms. Bland followed him all the way to the men's bathroom, stood there and waited for him to come out while calling out his name.

87.    Tiana Barksdale, asked Ms. Bland for permission to leave so she could take her kids to school.  However, Ms. Bland refused Plaintiff's similar request.  By doing so, Plaintiff felt that his supervisor was affording Ms. Barksdale preferential treatment based on her sex.

88.    Then Plaintiff went to Mr. Ruben Gonzalez, another Supervisor (Hispanic), who worked closely with Ms. Bland, and told him that he could not stay because he had to pick up his son. Mr. Gonzalez's response was, "If you leave I hope you get a good Shop Steward Union Representative."

89.    On October 3, 2002, Plaintiff was assigned the Mahopac mail.  Plaintiff attempted to run the mail at 12 a.m., but Ms. Bland interrupted him and demanded that he go back to the Manual Aisle and to stay there until 1:30 a.m.  Moreover, a service talk was scheduled for 1:30 a.m., which mandated Plaintiff's attendance.

90.    Accordingly, Plaintiff could not start the Mahopac mail until 2:05 a.m.  At 2:15 a.m., Ms. Bland instructed Mr. Cover to relieve Ms. Tonya Pettaway, during her break. This caused the Mahopac mail to be delayed for another 30 minutes.  Plaintiff was unable to resume the processing of the Mahopac mail until 2:45 a.m. He also took his scheduled

lunch break at 3:30 a.m.  Plaintiff requested additional help, which was denied by Ms. Bland.  As a result, of Ms. Bland's conduct or lack thereof, the mail was not finalized until 8:15 a.m.

91.    Plaintiff believed that Ms. Bland was giving his female counterparts preferential treatment over him.  As a result, on October 3, 2002, Plaintiff filed an EEO complaint against his supervisor, Ms. Danielle Bland, for discriminating against him on the basis of his sex.

92.    On October 5, 2002, Ms. Bland caused Plaintiff to be issued a pre-disciplinary action for allegedly delaying the mail and sabotaging the operation on October 3, 2002.

93.    On October 5, 2002, at 2:30 a.m., Plaintiff was getting postcons (supplies) from Ms. Chaunda Filder, another employee.  Ms. Bland approached him and began shouting at him and demeaning him in the presence of his co-workers.

94.    On October 5, 2002, at 5:30 a.m., Mr. David Chastenet, White, came to Plaintiff's work station and began talking to Plaintiff. Ms. Bland saw the White employee talking, but did not chastise Mr. Chastenet as she did Mr. Cover, earlier that morning.

95.    On October 8, 2002 at 2:00 a.m., Plaintiff was returning from his break along with Mr. Larry Forst, a White co-worker.  Upon observing both, Ms. Bland approached Plaintiff, and falsely accused him of being late from break.  However, she did not say anything to Mr. Forst, even though they both left for break at the same time.

96.    On October 9, 2002, at 3:00 a.m., Plaintiff was asking a female co-worker, Sheena Williams, for a magic marker and scotch tape. Ms. Bland approached Plaintiff and began shouting at him.  Plaintiff informed her that he was getting supplies to dispatch

the Carrier Routes. She told Plaintiff that, she did not care, and if he did not go back to his machine, she would take additional disciplinary action against him.

97.     Meanwhile Mr. Jim Cunningham, a White employee, was away from his machine talking to Eddie, but Ms. Bland did not say anything to the White employee.

98.     On October 17, 2002, at 6:30 a.m., Ms. Bland approached Plaintiff and began yelling at him and falsely accusing him of working slow and "milking the mail". She also threatened to stand at his machine and watch him everyday. However, she said nothing to his partner, Ms. Maritsa Rivera, a Puerto Rican co-worker.

99.     On October 26, 2002, the APWU Shop Steward, Mr. Joe T. told Plaintiff that Danielle Bland wanted to issue him a disciplinary action.  When Plaintiff inquired what would it be for, Mr. T. responded that Ms. Bland has not thought of any charges yet.

100.     On November 3, 2002, at 1:15 a.m., Ms. Bland approached Plaintiff while he was tying his shoe laces in a seated position, and began yelling at him.  Meanwhile Ms. Tiana Barksdale, was sitting down at DBCS#18 talking to Ms. Adamay Benson, another co-worker, but Ms. Bland did not say anything to either female worker.

101.     On November 9, 2002, at 6:30 a.m., Plaintiff told Ms. Bland that he could not stay longer than his scheduled tour, because he had to pick up his child. She responded, "Wayne if you leave at the end of your shift, I'm going to take disciplinary action against you!" Plaintiff told Ms. Bland that he just received a phone call that his boy was sick. Her response was, "That's your problem, not mine!"

102.     Both Ms. Bland and Mr. Gonzalez then approached Plaintiff at 6:45 a.m., and he was instructed by Ms. Bland to stay until the mail was finished. However, Ms. Bland

allowed Ms. Rivera to take her smoke and bathroom breaks from 6:55 am to 7:15 a.m. before the mail was finished.

103.    On or about November 11, 2002, Plaintiff was issued a letter of warning ("LOW") by Mr. Ruben Gonzalez, for allegedly leaving before the mail was finalized.  The LOW was issued at Ms. Bland's direction.  She also claimed that Plaintiff never told her that he had to pick up his child and if she would have known, she would not have asked that a LOW be issued.

104.    Plaintiff timely grieved this retaliatory conduct through his Union.  Plaintiff viewed Ms. Bland's action as retaliation for filing his EEO Complaint.

105.    Although Mr. Gonzalez issued Plaintiff a LOW for 11-11-2002, for leaving to take care of his sick son, he allowed three of Plaintiff's partners to leave before the mail was finalized, without penalizing them.

106.    On November 6, 2002, Mr. Gonzalez allowed Haipeng, "Joe" Zhao, a Chinese male, to leave before the mail was finalized.  On December 2, 2002, Mr. Gonzalez allowed Maritsa Rivera, a light skinned Puerto Rican female, to leave before the mail was finalized.  On December 11, 2002, Mr. Gonzalez allowed Robert Gongorra, a Central American, to leave before the mail was finalized.  On all three occasions, Mr. Cover was left without a partner to finalize the mail, by himself.

107.    On November 16, 2002, Plaintiff attended the Step One Grievance which involved supervisor Ruben Gonzalez, and Rita Patrick, Union Vice-President.  Plaintiff explained to Mr. Gonzalez that he could not stay to finalize the mail because his son was sick. Plaintiff also explained to Mr. Gonzalez that he informed Ms. Bland of the same. Mr. Gonzalez said he was unaware that Plaintiff's son was sick and he would drop the

charges but he had to speak with Ms. Bland before he could rescind the disciplinary Letter of Warning.

108.    One week later on November 23, 2002, Mr.  Gonzalez told Rita Patrick that he would not rescind the Letter of Warning, as Ms. Bland would not allow it.

109.    On November 24, 2002 at 12:30 a.m., Ms. Bland approached Plaintiff, while he was tying his shoes and insisted that he tie his shoe laces standing up.  Meanwhile, Elida Reyes, a light skinned Puerto Rican woman, was allowed to sit down behind her machine, eat fruits and read a magazine. Ms. Bland walked right past Ms. Reyes and did not say anything to her.

110.    Plaintiff was made to finish the mail on several occasions by himself, without a partner.  However, when he could not stay to work overtime, he was penalized. Other employees, including many of his partners, have left when the mail was not finished and were not penalized.

111.    For example, On December 2, 2002, Plaintiff was working on the Mahopac mail with his partner Maritsa Rivera, a Puerto Rican female, when she was allowed to leave early.  Plaintiff was sent to lunch at 5 a.m., and was rushed back to work at 5:20 a.m. After Mr. Cover realized that his partner left and that he would need another partner, he asked Mr. Gonzalez for help.  However, Mr. Gonzalez insisted that Plaintiff finish the mail by himself.

112.    There are 25 machines in the DBCS Area and Plaintiff was the only person out of 50 people who had to finalize the mail by himself, during his assigned tour.

113.    On December 8, 2002, Plaintiff returned from his break to see Ms. Bland waiting for him at his machine.  When Ms. Bland saw him, she began yelling, and falsely accusing him of being late.  Several Puerto Rican women, namely Elida Reyes, Evelyn Oliavarria and Plaintiff's partner Veronica Denizard, walked in with Plaintiff.  Ms. Bland

did not yell at them or accuse them of being late, although they left for their respective breaks at the same time as Plaintiff.

114.    On December 18, 2002, Ms. Bland called mandatory overtime.  Plaintiff's partner, Ms. Anjanette Alexander, told Ms. Bland she could not stay because she had to pick up her children and asked for a 3971 Leave Slip.  Within five minutes, Ms. Bland returned with a 3971 form for Ms. Alexander.  On November 9, 2002, Plaintiff informed Ms. Bland that he could not stay because he had to pick up his son and requested a 3971 but Ms. Bland denied his request by stating "that's your problem, not mine."

115.    On December 21, 2002, Ms. Bland approached Plaintiff and told him that he could not talk.  Meanwhile, Ms. Glory Frazier, and Ms. Veronica Denizard, a Puerto Rican, were also talking, yet Ms. Bland said nothing to them.

116.    In December 2002, Plaintiff submitted medical documentations from his healthcare provider(s) regarding his disability (Depression/Anxiety Syndrome Complex).

117.    On January 5, 2003, Ms. Bland told Plaintiff, "You have never done anything physically, but your whole demeanor is threatening! Take a good look at yourself in the mirror and you'll see what I'm talking about! I don't feel safe around you! Every time I'm near you, I feel like you are going to snap and attack me!"

118.    On January 5, 2003, at 11:00 a.m., Ms. Bland gave Plaintiff an attendance slip dated January 4, 2003, for failure to report. Plaintiff explained to Ms. Bland that he was scheduled for two days off, at the request of by his healthcare provider(s) through the Employee Assistance Program. As such, Plaintiff's Immediate Supervisor, Gretchen McGhee, scheduled him to have that night off.

119.    On January 27, 2003, Plaintiff asked Mr. Patterson if he could use his marker and tape. As Plaintiff went behind the feeder to get the marker and tape, Ms. Bland raced towards him yelling and screaming for him to go back to his machine.  Plaintiff then tried to explain to Ms. Bland that Mr. Patterson was letting him use his marker and tape and that he had to talk to him to get his permission first.  Ms. Bland's response was, "I don't care! I don't want you talking to him!"  Plaintiff immediately went back to his machine.

120.    During the shift, at 1:30 a.m., Ms. Bland called Plaintiff inside her office to issue him a seven-day suspension for being out of his work area. This disciplinary hearing took place in the presence of the Local Union Vice-President, Rita Patrick. When Plaintiff advised Ms. Bland that after, he dropped off a direct tray of mail he was in the process of borrowing supplies, her response was, "Don't worry about it, you can go back to your machine now."

121.    On the same shift, Ms. Tsi Tsi Chen, a Chinese female, left her work area to give Plaintiff a direct tray of mail.  Ms. Bland came over to Plaintiff's machine while Ms. Chen was there talking to Plaintiff, but said nothing to Ms. Chen.

122.    On February 6, 2003, Plaintiff participated in the EEO mediation process but declined to drop his charges of harassment and discrimination against Ms. Bland and Mr. Gonzalez.

123.    On February 8, 2003, Plaintiff returned back to work from his day off, where Ms. Bland called him inside her office and issued him a seven-day suspension.  Plaintiff again timely grieved this retaliatory conduct through his Union because he believed Ms. Bland was retaliating against him because, he did not drop the charges against her, two days earlier.

124.    In February 2003, Plaintiff complained to Joseph Terracciano, Tour One Union Shop Steward; Arlene McDuffie, Tour One Union Shop Steward; Kevin Grant, Tour One Union Shop Steward; Rita Patrick, Union Vice President; Frank Fanelli, Union President; Louise Yannuzi, National Business Agent for Union; Grace Dellapi, Tour One Manager; Donald Burke, Tour One Manager; Jack Corso, Tour One Supervisor; Janice Parks, Whitman Company Psychiatrist of the Employee Assistance Program; and Alan Dockeray, Medical Doctor regarding the discriminatory remarks made by Ms. Bland about his appearance and perceived mental disability, as well as her constant discriminatory harassment of him.

125.    Defendant's agents were aware that Plaintiff could not work in the DBCS Area because he submitted medical documentation from both his Therapist and Medical Doctor.  They initially advised him not to work in the DBCS Area in April 2003, due to the stress, he was experiencing at the hands of Ms. Bland, which exacerbated his already existing mental condition.

126.    On May 9, 2003, Ms. Bland changed Plaintiff's schedule from (12 a.m. - 6 a.m.) to (1 a.m. - 7 a.m.).  Ms. Bland claimed that the reason for the schedule change was to accommodate his 6 hour work limitation.  However, Plaintiff believes that this schedule change is discriminatory because other employees namely, Henry Aguilo and Daisy Cabrera, both Puerto Ricans, can only work 6 hours but their respective schedules were not changed in the same manner as Plaintiff.  Plaintiff's schedule change interfered with his work productivity, amongst others.  Moreover, Plaintiff believes the schedule change was in further retaliation for engaging in protected activity.

127.   Notwithstanding the medical documentation, on May 16, 2003, Defendant assigned Plaintiff to the DBCS Area commencing at 1:00 a.m.  More importantly, all the other Part-Time Flexible Mail Processors were assigned to man their machines at 12:00 a.m. Additionally, Ms. Bland made Plaintiff operate the machine without a partner for two hours. Additionally, the other Part-Time Flexible Mail Processors had partners.

128.   Plaintiff informed Ms. Bland that he needed a partner and that the mail would be late if he did not get assistance. Ms. Bland's response was, "You will have to run the mail by yourself until I send someone over!" Ms. Bland did not give Plaintiff a partner until 3:00 a.m.  Ms. Bland assigned Emily Cruz as his partner, a Filipino female.

129.   At 6:15 a.m., Ms. Bland called Plaintiff and asked if he sent out any rejects with the carrier routes. Plaintiff told Ms. Bland he did and went back to sweeping the machine. Ms. Bland called him back over again and accused him of not sending out any rejects with the carrier routes. Plaintiff informed Ms. Bland that four trays of third-class mail and one tray of first-class mail arrived at their machine after they turned over to the second pass. His partner, Emily Cruz, confirmed the same with Ms. Bland.  However, Ms. Bland unsatisfied, began to yell at her and instructed her to, "Stay out of it!" Ms. Bland then falsely accused Plaintiff of sabotaging the operation.

130.   As a result of Ms. Bland's harassment, Plaintiff experienced a headache and requested that Ms. Bland stop harassing him.  She did not.  Ms. Bland returned to Plaintiff's machine with another supervisor, Virginia Ross, and continued to falsely accuse Plaintiff of holding back seven trays of mail for Mahopac. Ms. Bland finally turned to Plaintiff and declared, "You are sick in the head and you need help!"

131.    On May 17, 2003, Ms. Bland penalized Plaintiff for the incident by issuing him a 14 day suspension, however, she did not discipline Plaintiff's partner Emily Cruz, as both partners were equally responsible for the alleged mail delay they processed.

132.    This discriminatory incident caused Plaintiff's heartbeat to accelerate rapidly and he began to get a headache.  He then asked Ms. Bland to send him to the hospital because he was in pain.  She refused asserting, "It's 6:00 a.m., punch out and take yourself to the hospital!"  Arlene McDuffie, a Shop Steward, witnessed Ms. Bland's denial of Plaintiff's request for medical attention.

133.    Due to Ms. Bland's discriminatory conduct, Plaintiff's medical/mental condition worsened.  Plaintiff could not work in the stressful DBCS Area, nor work more than six hours a day, and must have two consecutive days off every week.  Plaintiff submitted medical documentation supporting these work restrictions and medical requests, from his health care providers.

134.    On June 5, 2003, Plaintiff was transferred out of the DBCS Area due to Ms. Bland's induced stress and anxiety.

135.    On December 7, 2003, Plaintiff was working in the Manual Aisle.  Supervisor Bland approached him and inquired about his presence there.  He explained that his supervisor, Mr. Jack Corso, sent him there.  Meanwhile, there were other female workers, namely, Tsi Tsi Chen, Chinese; and Emily Cruz, Filipino talking with other workers as well.  Ms. Bland then asked Mr. Corso if he sent Plaintiff to the Manual Aisle and he responded, "Yes, what's the problem?"  She then alleged that Plaintiff was talking and not working.  Mr. Corso responded by saying, "everyone is talking, he isn't doing anything wrong, leave him alone, I just sent him over there."  He also told her she was wrong and

that she should stop harassing Plaintiff.  Ms. Bland then went to a manager, Mr. Steve Grant, to complain about Plaintiff and his supervisor.

136.    On August 2, 2004, at 5:30 a.m. while Plaintiff was working in the OCR area, he was called into the office, located near the DBCS Area, by supervisor Illonka McPartland.  Accompanied with Ms. McPartland was Attendance Control Supervisor, Kathi Lamberti, and Union Representative, Marcus Gwire. Ms. McPartland informed Plaintiff that she received a letter from in-plant support stating that Plaintiff was fit for full duty and that she needs him to work in the DBCS Area.

137.    This was a sudden surprise to Plaintiff, since he has always performed full duty. The only accommodations he required were that he not work in the DBCS Area, that he only work 6 hours a day, and he have 2 consecutive days off.

138.    Plaintiff asked that he be accommodated, however, after consulting with Ms. Bland, Ms. McPartland denied that request and ordered the Plaintiff to work in the DBCS Area, changed his schedule and gave him only one day off.  All in violation of his rights to accommodation.

139.    On August 5, 2004 at 12:10 a.m., Ms. McPartland approached Plaintiff and told him to go to DBCS #11. Plaintiff again informed Ms. Mc Partland that due to his medical condition, he could not work in the DBCS Area. Ms. Mc Partland told Plaintiff, "I am going to get a Shop Steward and take you off the clock!" Five minutes later, Ms. McPartland approached Plaintiff and said, "You are officially off the clock!"  Plaintiff then asked Ms. McPartland if she contacted a Shop Steward, and she said, "Find yourself a Shop Steward!"

140.    Plaintiff complained to the Union representative Ms. Arlene McDuffie, about his newly assigned duties. The Union agreed that Management has violated Plaintiff's medical rights and a timely grievance was filed.

141.    On August 7, 2004 at 11:55 a.m., Plaintiff as requested, gave Ms. McPartland an updated note from his health provider(s) concerning his medical condition. Ms. Mc Partland took the note and discussed it with Ms. Bland. After her Conference with Ms. Bland, Ms. McPartland approached Plaintiff and said, "I received instructions not to let you on the clock unless you are willing to work in the DBCS Area!"  Plaintiff informed Ms. McPartland that he could work in any and all areas except for the DBCS Area.  Her response was that he will only be assigned to work in the DBCS Area.

142.    As of August 7, 2004, Plaintiff was not allowed to work unless he worked in the DBCS Area.  Plaintiff viewed Defendant's conduct as a constructive discharge, because working in the DBCS Area is detrimental to his health.

143.    Upon information and belief, two employees, namely David Chastenet, White male; and Andrea McKenzi, light skinned Black female, cannot work in the DBCS Area due to their medical conditions, and they have been accommodated accordingly by Management.

144.    Plaintiff tried to get Defendant to remedy his retaliatory and discriminatory work environment, to no avail.

145.    Defendant's disparate treatment of Plaintiff and Mr. Cover's constructive discharge is discriminatory and in retaliation against him for engaging in protected activity, all in violation of Federal Law.  Defendant's conduct has caused Plaintiff to suffer loss of income, mental and emotional harm, and other non-pecuniary losses.

146.    Mr. Cover's termination by Defendant was in retaliation for engaging in protected activity, and amongst others, in violation Title VII, 42 U.S.C. § 2000(e) et seq.

147.    In intentionally taking the above described discriminatory and punitive actions against Plaintiff, Defendant through their servants, agents and employees, were in violation of Plaintiff's rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S. C. § 2000 (e) et seq.

**AS FOR A SECOND CAUSE OF ACTION:**
**REHABILITATION ACT OF 1973, as amended, 29 U.S.C. § 794(a), et seq.**
**(Failure To Accommodate, And Retaliation And Discrimination On Account Of**
**Plaintiff's Disability Or Perceived Disability**
**By Defendant, John E. Potter, Postmaster General)**

148.    Plaintiff repeats and re-avers each and every one of the allegations set forth in paragraphs 1 through 147 of this complaint with the same force and effect as if each was fully set forth herein.

149.    Plaintiff is a member of a protected class, covered by 29 U.S.C. § 794(a), et seq., in that he suffers from Depression/Anxiety Syndrome Complex, and engaged in protected activity.

150.    In 1997, Plaintiff began his employment with Defendant Employer as a Part Time Flexible Mail Processor.

151.    At all relevant times, Plaintiff's work performance, time and attendance were satisfactory.

152.    Mr. Cover is a Dark Skinned African-American Male, who suffers from Depression/Anxiety Syndrome Complex.

153.   From 1997 until November 2002, Plaintiff was never disciplined.  He became the subject of discipline shortly after he complained that his supervisor, namely Ms. Danielle Bland, a White female, was discriminating against him.

154.   After Ms. Bland became his supervisor, he became the subject of her harassment and discriminatory conduct based on his sex, color, race, and perceived mental disability.

155.   On October 2, 2002, after Plaintiff finished processing his mail on DBCS #6, he approached Ms. Bland, who was working around DBCS #18, because she had instructed him to inform her when he finished processing the mail at his station.

156.   Ms. Bland told Plaintiff that at the conclusion of his shift, he needs to take over DBCS #18, because another female employee, namely, Tiana Barksdale had to go home. Plaintiff informed Ms. Bland that he could not stay because he had to take his kids to school.  Ms. Bland responded, "That's not my problem! If you leave I'm going to take disciplinary action! Now stay over here and finish this mail!"

157.   As Plaintiff walked away, Ms. Bland followed him all the way to the men's bathroom, stood there and waited for him to come out while calling out his name.

158.   Tiana Barksdale, asked Ms. Bland for permission to leave so she could take her kids to school.  However, Ms. Bland refused Plaintiff's similar request.  By doing so, Plaintiff felt that his supervisor was affording Ms. Barksdale preferential treatment based on her sex.

159.   Then Plaintiff went to Mr. Ruben Gonzalez, another Supervisor (Hispanic), who worked closely with Ms. Bland, and told him that he could not stay because he had to pick up his son. Mr. Gonzalez's response was, "If you leave I hope you get a good Shop Steward Union Representative."

160.   On October 3, 2002, Plaintiff was assigned the Mahopac mail.  Plaintiff attempted to run the mail at 12 a.m., but Ms. Bland interrupted him and demanded that he go back to the Manual Aisle and to stay there until 1:30 a.m.   Moreover, a service talk was scheduled for 1:30 a.m., which mandated Plaintiff's attendance.

161.   Accordingly, Plaintiff could not start the Mahopac mail until 2:05 a.m.  At 2:15 a.m., Ms. Bland instructed Mr. Cover to relieve Ms. Tonya Pettaway, during her break. This caused the Mahopac mail to be delayed for another 30 minutes.  Plaintiff was unable to resume the processing of the Mahopac mail until 2:45 a.m. He also took his scheduled lunch break at 3:30 a.m.  Plaintiff requested additional help, which was denied by Ms. Bland.  As a result, of Ms. Bland's conduct or lack thereof, the mail was not finalized until 8:15 a.m.

162.   Plaintiff believed that Ms. Bland was giving his female counterparts preferential treatment over him.  As a result, on October 3, 2002, Plaintiff filed an EEO complaint against his supervisor, Ms. Danielle Bland, for discriminating against him on the basis of his sex.

163.   On October 5, 2002, Ms. Bland caused Plaintiff to be issued a pre-disciplinary action for allegedly delaying the mail and sabotaging the operation on October 3, 2002.

164.   On October 5, 2002, at 2:30 a.m., Plaintiff was getting postcons (supplies) from Ms. Chaunda Filder, another employee.  Ms. Bland approached him and began shouting at him and demeaning him in the presence of his co-workers.

165.   On October 5, 2002, at 5:30 a.m., Mr. David Chastenet, White, came to Plaintiff's work station and began talking to Plaintiff. Ms. Bland saw the White employee talking, but did not chastise Mr. Chastenet as she did Mr. Cover, earlier that morning.

166.    On October 8, 2002 at 2:00 a.m., Plaintiff was returning from his break along with Mr. Larry Forst, a White co-worker.   Upon observing both, Ms. Bland approached Plaintiff, and falsely accused him of being late from break.   However, she did not say anything to Mr. Forst, even though they both left for break at the same time.

167.    On October 9, 2002, at 3:00 a.m., Plaintiff was asking a female co-worker, Sheena Williams, for a magic marker and scotch tape. Ms. Bland approached Plaintiff and began shouting at him.  Plaintiff informed her that he was getting supplies to dispatch the Carrier Routes. She told Plaintiff that, she did not care, and if he did not go back to his machine, she would take additional disciplinary action against him.

168.    Meanwhile Mr. Jim Cunningham, a White employee, was away from his machine talking to Eddie, but Ms. Bland did not say anything to the White employee.

169.    On October 17, 2002, at 6:30 a.m., Ms. Bland approached Plaintiff and began yelling at him and falsely accusing him of working slow and "milking the mail". She also threatened to stand at his machine and watch him everyday. However, she said nothing to his partner, Ms. Maritsa Rivera, a Puerto Rican co-worker.

170.    On October 26, 2002, the APWU Shop Steward, Mr. Joe T. told Plaintiff that Danielle Bland wanted to issue him a disciplinary action.  When Plaintiff inquired what would it be for, Mr. T. responded that Ms. Bland has not thought of any charges yet.

171.    On November 3, 2002, at 1:15 a.m., Ms. Bland approached Plaintiff while he was tying his shoe laces in a seated position, and began yelling at him.  Meanwhile Ms. Tiana Barksdale, was sitting down at DBCS#18 talking to Ms. Adamay Benson, another co-worker, but Ms. Bland did not say anything to either female worker.

172.    On November 9, 2002, at 6:30 a.m., Plaintiff told Ms. Bland that he could not stay longer than his scheduled tour, because he had to pick up his child. She responded, "Wayne if you leave at the end of your shift, I'm going to take disciplinary action against you!" Plaintiff told Ms. Bland that he just received a phone call that his boy was sick. Her response was, "That's your problem, not mine!"

173.    Both Ms. Bland and Mr. Gonzalez then approached Plaintiff at 6:45 a.m., and he was instructed by Ms. Bland to stay until the mail was finished. However, Ms. Bland allowed Ms. Rivera to take her smoke and bathroom breaks from 6:55 am to 7:15 a.m. before the mail was finished.

174.    On or about November 11, 2002, Plaintiff was issued a letter of warning ("LOW") by Mr. Ruben Gonzalez, for allegedly leaving before the mail was finalized.  The LOW was issued at Ms. Bland's direction.  She also claimed that Plaintiff never told her that he had to pick up his child and if she would have known, she would not have asked that a LOW be issued.

175.    Plaintiff timely grieved this retaliatory conduct through his Union.  Plaintiff viewed Ms. Bland's action as retaliation for filing his EEO Complaint.

176.    Although Mr. Gonzalez issued Plaintiff a LOW for 11-11-2002, for leaving to take care of his sick son, he allowed three of Plaintiff's partners to leave before the mail was finalized, without penalizing them.

177.    On November 6, 2002, Mr. Gonzalez allowed Haipeng, "Joe" Zhao, a Chinese male, to leave before the mail was finalized.  On December 2, 2002, Mr. Gonzalez allowed Maritsa Rivera, a light skinned Puerto Rican female, to leave before the mail was finalized.  On December 11, 2002, Mr. Gonzalez allowed Robert Gongorra, a Central

American, to leave before the mail was finalized.  On all three occasions, Mr. Cover was left without a partner to finalize the mail, by himself.

178.    On November 16, 2002, Plaintiff attended the Step One Grievance which involved supervisor Ruben Gonzalez, and Rita Patrick, Union Vice-President.  Plaintiff explained to Mr. Gonzalez that he could not stay to finalize the mail because his son was sick. Plaintiff also explained to Mr. Gonzalez that he informed Ms. Bland of the same. Mr. Gonzalez said he was unaware that Plaintiff's son was sick and he would drop the charges but he had to speak with Ms. Bland before he could rescind the disciplinary Letter of Warning.

179.    One week later on November 23, 2002, Mr.  Gonzalez told Rita Patrick that he would not rescind the Letter of Warning, as Ms. Bland would not allow it.

180.    On November 24, 2002 at 12:30 a.m., Ms. Bland approached Plaintiff, while he was tying his shoes and insisted that he tie his shoe laces standing up.  Meanwhile, Elida Reyes, a light skinned Puerto Rican woman, was allowed to sit down behind her machine, eat fruits and read a magazine. Ms. Bland walked right past Ms. Reyes and did not say anything to her.

181.    Plaintiff was made to finish the mail on several occasions by himself, without a partner.  However, when he could not stay to work overtime, he was penalized. Other employees, including many of his partners, have left when the mail was not finished and were not penalized.

182.    For example, On December 2, 2002, Plaintiff was working on the Mahopac mail with his partner Maritsa Rivera, a Puerto Rican female, when she was allowed to leave early.  Plaintiff was sent to lunch at 5 a.m., and was rushed back to work at 5:20 a.m. After Mr. Cover realized that his partner left and that he would need another partner, he

asked Mr. Gonzalez for help.  However, Mr. Gonzalez insisted that Plaintiff finish the mail by himself.

183.   There are 25 machines in the DBCS Area and Plaintiff was the only person out of 50 people who had to finalize the mail by himself, during his assigned tour.

184.   On December 8, 2002, Plaintiff returned from his break to see Ms. Bland waiting for him at his machine.  When Ms. Bland saw him, she began yelling, and falsely accusing him of being late.  Several Puerto Rican women, namely Elida Reyes, Evelyn Oliavarria and Plaintiff's partner Veronica Denizard, walked in with Plaintiff.  Ms. Bland did not yell at them or accuse them of being late, although they left for their respective breaks at the same time as Plaintiff.

185.   On December 18, 2002, Ms. Bland called mandatory overtime.  Plaintiff's partner, Ms. Anjanette Alexander, told Ms. Bland she could not stay because she had to pick up her children and asked for a 3971 Leave Slip.  Within five minutes, Ms. Bland returned with a 3971 form for Ms. Alexander.  On November 9, 2002, Plaintiff informed Ms. Bland that he could not stay because he had to pick up his son and requested a 3971 but Ms. Bland denied his request by stating "that's your problem, not mine."

186.   On December 21, 2002, Ms. Bland approached Plaintiff and told him that he could not talk.  Meanwhile, Ms. Glory Frazier, and Ms. Veronica Denizard, a Puerto Rican, were also talking, yet Ms. Bland said nothing to them.

187.   In December 2002, Plaintiff submitted medical documentations from his healthcare provider(s) regarding his disability (Depression/Anxiety Syndrome Complex).

188.   On January 5, 2003, Ms. Bland told Plaintiff, "You have never done anything physically, but your whole demeanor is threatening! Take a good look at yourself in the

mirror and you'll see what I'm talking about! I don't feel safe around you! Every time I'm near you, I feel like you are going to snap and attack me!"

189.    On January 5, 2003, at 11:00 a.m., Ms. Bland gave Plaintiff an attendance slip dated January 4, 2003, for failure to report. Plaintiff explained to Ms. Bland that he was scheduled for two days off, at the request of by his healthcare provider(s) through the Employee Assistance Program. As such, Plaintiff's Immediate Supervisor, Gretchen McGhee, scheduled him to have that night off.

190.    On January 27, 2003, Plaintiff asked Mr. Patterson if he could use his marker and tape. As Plaintiff went behind the feeder to get the marker and tape, Ms. Bland raced towards him yelling and screaming for him to go back to his machine.  Plaintiff then tried to explain to Ms. Bland that Mr. Patterson was letting him use his marker and tape and that he had to talk to him to get his permission first.  Ms. Bland's response was, "I don't care! I don't want you talking to him!"  Plaintiff immediately went back to his machine.

191.    During the shift, at 1:30 a.m., Ms. Bland called Plaintiff inside her office to issue him a seven-day suspension for being out of his work area. This disciplinary hearing took place in the presence of the Local Union Vice-President, Rita Patrick. When Plaintiff advised Ms. Bland that after, he dropped off a direct tray of mail he was in the process of borrowing supplies, her response was, "Don't worry about it, you can go back to your machine now."

192.    On the same shift, Ms. Tsi Tsi Chen, a Chinese female, left her work area to give Plaintiff a direct tray of mail.  Ms. Bland came over to Plaintiff's machine while Ms. Chen was there talking to Plaintiff, but said nothing to Ms. Chen.

193.    On February 6, 2003, Plaintiff participated in the EEO mediation process but declined to drop his charges of harassment and discrimination against Ms. Bland and Mr. Gonzalez.

194.    On February 8, 2003, Plaintiff returned back to work from his day off, where Ms. Bland called him inside her office and issued him a seven-day suspension.  Plaintiff again timely grieved this retaliatory conduct through his Union because he believed Ms. Bland was retaliating against him because, he did not drop the charges against her, two days earlier.

195.    In February 2003, Plaintiff complained to Joseph Terracciano, Tour One Union Shop Steward; Arlene McDuffie, Tour One Union Shop Steward; Kevin Grant, Tour One Union Shop Steward; Rita Patrick, Union Vice President; Frank Fanelli, Union President; Louise Yannuzi, National Business Agent for Union; Grace Dellapi, Tour One Manager; Donald Burke, Tour One Manager; Jack Corso, Tour One Supervisor; Janice Parks, Whitman Company Psychiatrist of the Employee Assistance Program; and Alan Dockeray, Medical Doctor regarding the discriminatory remarks made by Ms. Bland about his appearance and perceived mental disability, as well as her constant discriminatory harassment of him.

196.    Defendant's agents were aware that Plaintiff could not work in the DBCS Area because he submitted medical documentation from both his Therapist and Medical Doctor.  They initially advised him not to work in the DBCS Area in April 2003, due to the stress, he was experiencing at the hands of Ms. Bland, which exacerbated his already existing mental condition.

197.    On May 9, 2003, Ms. Bland changed Plaintiff's schedule from (12 a.m. - 6 a.m.) to (1 a.m. - 7 a.m.).  Ms. Bland claimed that the reason for the schedule change was to accommodate his 6 hour work limitation.  However, Plaintiff believes that this schedule change is discriminatory because other employees namely, Henry Aguilo and Daisy Cabrera, both Puerto Ricans, can only work 6 hours but their respective schedules were not changed in the same manner as Plaintiff.  Plaintiff's schedule change interfered with his work productivity, amongst others.  Moreover, Plaintiff believes the schedule change was in further retaliation for engaging in protected activity.

198.    Notwithstanding the medical documentation, on May 16, 2003, Defendant assigned Plaintiff to the DBCS Area commencing at 1:00 a.m.  More importantly, all the other Part-Time Flexible Mail Processors were assigned to man their machines at 12:00 a.m. Additionally, Ms. Bland made Plaintiff operate the machine without a partner for two hours. Additionally, the other Part-Time Flexible Mail Processors had partners.

199.    Plaintiff informed Ms. Bland that he needed a partner and that the mail would be late if he did not get assistance. Ms. Bland's response was, "You will have to run the mail by yourself until I send someone over!" Ms. Bland did not give Plaintiff a partner until 3:00 a.m.  Ms. Bland assigned Emily Cruz as his partner, a Filipino female.

200.    At 6:15 a.m., Ms. Bland called Plaintiff and asked if he sent out any rejects with the carrier routes. Plaintiff told Ms. Bland he did and went back to sweeping the machine. Ms. Bland called him back over again and accused him of not sending out any rejects with the carrier routes. Plaintiff informed Ms. Bland that four trays of third-class mail and one tray of first-class mail arrived at their machine after they turned over to the second pass. His partner, Emily Cruz, confirmed the same with Ms. Bland.  However, Ms. Bland

unsatisfied, began to yell at her and instructed her to, "Stay out of it!" Ms. Bland then falsely accused Plaintiff of sabotaging the operation.

201.    As a result of Ms. Bland's harassment, Plaintiff experienced a headache and requested that Ms. Bland stop harassing him.  She did not.  Ms. Bland returned to Plaintiff's machine with another supervisor, Virginia Ross, and continued to falsely accuse Plaintiff of holding back seven trays of mail for Mahopac. Ms. Bland finally turned to Plaintiff and declared, "You are sick in the head and you need help!"

202.    On May 17, 2003, Ms. Bland penalized Plaintiff for the incident by issuing him a 14 day suspension, however, she did not discipline Plaintiff's partner Emily Cruz, as both partners were equally responsible for the alleged mail delay they processed.

203.    This discriminatory incident caused Plaintiff's heartbeat to accelerate rapidly and he began to get a headache.  He then asked Ms. Bland to send him to the hospital because he was in pain.  She refused asserting, "It's 6:00 a.m., punch out and take yourself to the hospital!"  Arlene McDuffie, a Shop Steward, witnessed Ms. Bland's denial of Plaintiff's request for medical attention.

204.    Due to Ms. Bland's discriminatory conduct, Plaintiff's medical/mental condition worsened.  Plaintiff could not work in the stressful DBCS Area, nor work more than six hours a day, and must have two consecutive days off every week.  Plaintiff submitted medical documentation supporting these work restrictions and medical requests, from his health care providers.

205.    On June 5, 2003, Plaintiff was transferred out of the DBCS Area due to Ms. Bland's induced stress and anxiety.

206.    On December 7, 2003, Plaintiff was working in the Manual Aisle.  Supervisor Bland approached him and inquired about his presence there.  He explained that his supervisor, Mr. Jack Corso, sent him there.  Meanwhile, there were other female workers, namely, Tsi Tsi Chen, Chinese; and Emily Cruz, Filipino talking with other workers as well.  Ms. Bland then asked Mr. Corso if he sent Plaintiff to the Manual Aisle and he responded, "Yes, what's the problem?"  She then alleged that Plaintiff was talking and not working.  Mr. Corso responded by saying, "everyone is talking, he isn't doing anything wrong, leave him alone, I just sent him over there."  He also told her she was wrong and that she should stop harassing Plaintiff.  Ms. Bland then went to a manager, Mr. Steve Grant, to complain about Plaintiff and his supervisor.

207.    On August 2, 2004, at 5:30 a.m. while Plaintiff was working in the OCR area, he was called into the office, located near the DBCS Area, by supervisor Illonka McPartland.  Accompanied with Ms. McPartland was Attendance Control Supervisor, Kathi Lamberti, and Union Representative, Marcus Gwire. Ms. McPartland informed Plaintiff that she received a letter from in-plant support stating that Plaintiff was fit for full duty and that she needs him to work in the DBCS Area.

208.    This was a sudden surprise to Plaintiff, since he has always performed full duty.  The only accommodations he required were that he not work in the DBCS Area, that he only work 6 hours a day, and he have 2 consecutive days off.

209.    Plaintiff asked that he be accommodated, however, after consulting with Ms. Bland, Ms. McPartland denied that request and ordered the Plaintiff to work in the DBCS Area, changed his schedule and gave him only one day off.  All in violation of his rights to accommodation.

210.   On August 5, 2004 at 12:10 a.m., Ms. McPartland approached Plaintiff and told him to go to DBCS #11. Plaintiff again informed Ms. Mc Partland that due to his medical condition, he could not work in the DBCS Area. Ms. Mc Partland told Plaintiff, "I am going to get a Shop Steward and take you off the clock!" Five minutes later, Ms. McPartland approached Plaintiff and said, "You are officially off the clock!"  Plaintiff then asked Ms. McPartland if she contacted a Shop Steward, and she said, "Find yourself a Shop Steward!"

211.   Plaintiff complained to the Union representative Ms. Arlene McDuffie, about his newly assigned duties. The Union agreed that Management has violated Plaintiff's medical rights and a timely grievance was filed.

212.   On August 7, 2004 at 11:55 a.m., Plaintiff as requested, gave Ms. McPartland an updated note from his health provider(s) concerning his medical condition. Ms. Mc Partland took the note and discussed it with Ms. Bland. After her Conference with Ms. Bland, Ms. McPartland approached Plaintiff and said, "I received instructions not to let you on the clock unless you are willing to work in the DBCS Area!"  Plaintiff informed Ms. McPartland that he could work in any and all areas except for the DBCS Area.  Her response was that he will only be assigned to work in the DBCS Area.

213.   As of August 7, 2004, Plaintiff was not allowed to work unless he worked in the DBCS Area.  Plaintiff viewed Defendant's conduct as a constructive discharge, because working in the DBCS Area is detrimental to his health.

214.   Upon information and belief, two employees, namely David Chastenet, White male; and Andrea McKenzi, light skinned Black female, cannot work in the DBCS Area

due to their medical conditions, and they have been accommodated accordingly by Management.

215.    Plaintiff tried to get Defendant to remedy his retaliatory and discriminatory work environment, to no avail.

216.    Defendant's disparate treatment of Plaintiff and Mr. Cover's constructive discharge is discriminatory and in retaliation against him for engaging in protected activity, all in violation of Federal Law.  Defendant's conduct has caused Plaintiff to suffer loss of income, mental and emotional harm, and other non-pecuniary losses.

217.    Mr. Cover's termination by Defendant was on account of his mental disability, and in retaliation for engaging in protected activity, in violation, amongst others, of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794(a), et seq.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff **Wayne Cover**, hereby requests that judgment be entered in his behalf and against Defendant, as follows:

(a) A declaratory judgment that Defendant **John E. Potter, Postmaster General**, through his agents, servants, or employees, discriminated on the basis of Plaintiff's Race, Sex and retaliated against him, in the terms, conditions, and privileges of employment, in violation of 42 U.S.C.  § 2000(e) et seq., and the Rehabilitation Act of 1973, as Amended, 29 U.S.C. § 794(a), et seq., as for failing to accommodate Plaintiff's mental disability or perceived disability.

(b) Injunctive relief permanently restraining and enjoining Defendant from making employment decisions on the basis of Race, Sex, Mental Disability, or

Retaliation for engaging in protected activity against its employees and monitoring this Defendant's employment practices;

(c) Requiring Defendant Employer, to reinstate and clear Plaintiff's personnel record;

(d) That Plaintiff be awarded back pay with the appropriate pay scale commensurate with the duties and functions he performed, and benefits he has lost as a result of Defendant's unlawful discrimination against him, together with all interest on said amounts. Moreover, Plaintiff is seeking reinstatement and/or front pay.

(e) Requiring Defendant to pay all compensatory damages for Plaintiff's pain and suffering;

(f) Requiring Defendant to pay to plaintiff all reimbursable expenses;

(g) Requiring Defendant to pay under 42 U.S.C. § 2000(e) et seq., and other applicable statutes, reasonable attorney's fees and costs of this action; and for

(h) Such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury in this action.


Dated:  New York, New York
        August 8, 2005

                                Respectfully submitted,
                                Law Offices of LEE NUWESRA


                    **By:**    _____
                                Lee Nuwesra (LN 5851)
                                Attorney for Plaintiff
                                60 East 42nd Street, Suite 838
                                New York, New York 10017
                                (212)  682-0655

43

This document was created with Win2PDF available at http://www.daneprairie.com.
The unregistered version of Win2PDF is for evaluation or non-commercial use only.